United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

CHRISTOPHER PRATER,
Plaintiff,

v.

IRVIN GOODWIN, et al.,
Defendants.

Case No.5:14-cv-04876-HRL

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 57

Defendants Irvin Goodwin and the Homeless Veterans Emergency Housing Facility ("HVEHF" or "Facility")[1] move for summary judgment on all claims for relief. Pro se plaintiff Christopher Prater opposes the motion. Upon consideration of the moving and responding papers, as well as the oral arguments presented, this court grants defendants' motion.[2]

## BACKGROUND

Unless otherwise indicated, the following facts are undisputed.

Defendant Irvin Goodwin founded the HVEHF and is its Chief Executive Officer. (Goodwin Decl., ¶ 1). HVEHF is a private, non-profit organization. (Id. ¶ 2). The Facility contracts with the Department of Veterans Affairs (DVA) to provide services to homeless veterans

[1] Defendants say that the Facility erroneously was sued as "HVEHF Veteran Center."

[2] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by the undersigned. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

United States District Court
Northern District of California

who are referred to the Facility by the Veterans Administration (VA). However, HVEHF is not part of the DVA or the VA. (Id. ¶¶ 3-4). The services the Facility provides: a furnished room; meals; laundry facilities; and group meetings and workshops pertaining to life skills, social skills, finances, and alcohol and substance abuse issues. (Id. ¶ 4). HVEHF also provides case management services, in collaboration with services provided by the VA, to help veterans with self-care skills, adaptive coping skills, financial planning, permanent housing search, and vocational rehabilitation. (Id.).

Prater is a former resident of the Facility, who says that he has post-traumatic stress disorder and claims to have been diagnosed with paranoid schizophrenia. While living at the Facility, he attended mental health groups at the VA and meetings with his VA clinical psychologist, Rosemary Geiser. (Capabianco Decl., ¶ 4, Ex. B (Prater Depo. at 119:25-120:5, 140:10-12, 154:17-155:2).

In order to stay at the Facility and obtain its services, residents must comply with HVEHF's Transition General House Rules ("House Rules"), including the following:

- "HVEHF is NOT VA, we work in collaboration with the VA";
- "No arguing, belligerence, profanity, or violence of any kind, including threats or intimidation";
- "All rooms, bags and possessions will be checked at staff discretion at any time";
- "All residents are required to attend house meetings every week as scheduled";
- "All residents are required to attend the Relapse Prevention classes every Tuesday and Thursday from 10:30 a.m.-12PM, if not employed or in school";
- "Residents will be asked for additional support for bread runs, special chores, Friday GI party, etc."

(Goodwin Decl., ¶ 5; Capabianco Decl. ¶ 4, Ex. B (Prater Depo. at 31:8-32:8 & Ex. B-O); Perry Decl., ¶ 5, Ex. D).

When Prater first moved into the Facility in March 2014, he signed HVEHF's House Rules. (Capabianco Decl. ¶ 4, Ex. B (Prater Depo. at 31:8-32:8 & Ex. B-O); Perry Decl., ¶ 5, Ex.

D). In doing so, he acknowledged that he "signed, read, received a copy and understand[s] these rules." (Id.).

Prater also signed an HVEHF Resident Service Agreement ("Service Agreement"). Among other things, the Service Agreement provides:

> DAYTIME STRUCTURE:
>
> 1. I will attend the house meeting on Mondays at 5:00 p.m.
> 2. I will attend NA/AA meetings 2x per week (when applicable)
> 3. I will adhere to rules of the Veterans Housing Facility and continue to uphold my responsibilities (doing my chores, respecting curfew, etc.) while I am a resident here.

(Capabianco Decl. ¶ 4, Ex. B (Prater Depo. at 30:7-19 & Ex. B-M); Perry Decl. ¶ 6, Ex. E). Prater initialed each of the Service Agreement's provisions. And, just above his signature on the document is the following text:

> I have reviewed the HVEHF Veterans Program Service Agreement, and I agree to follow the rules and to live cooperatively in the facility with other veterans. I understand that violations of these rules are grounds for ***Immediate Discharge***.

(Id.).

In this lawsuit, Prater contends that while at the Facility, he suffered "emotional abuse," "forced labor," "harassment," "uncompromising forced living conditions," and "discrimination," as well as various constitutional and civil rights violations. (Capabianco Decl. ¶ 3, Ex. A; ¶ 4, Ex. B (Prater Depo. at 17:17-19:8 & Ex. B-B)). He alleges "repetitive threats by Irwin Goodwin to throw the people out who did not help in the complex." (Id. ¶ 3, Ex. A). Additionally, he says his allegations are based on the following incidents:

- In April 2014, lead case manager Kyle Terzian left a note on Prater's desk in his room, stating that he was "not in compliance" and "not following the guideline"; and, the desk was later removed from his room. (Capabianco Decl. ¶ 4, Ex. B (Prater Depo. at 75:9-78:1 & Ex. B-B at 3:17-23, 4:28-5:5, 6:24-7:1, 7:19-24, 20:12-18)).

United States District Court
Northern District of California

- Prater tried to give money to the cook for providing him with soup when he was sick. The cook refused the money, and Prater later heard that other (unidentified) people said that he tried to bribe the cook. (Id. ¶ 4, Ex. B (Prater Depo. at 99:22-101:16 & Ex. B-B at 3:28-4:6, 7:6-12, 16:16-22, 20:18-24)).
- The cook came to the dining room and asked residents for help with kitchen duties. When no one volunteered to help, Goodwin yelled at everyone, telling them that they needed to work or leave the HVEHF. (Id. ¶ 4, Ex. B (Prater Depo. at 114:4-116:1 & Ex. B-B at 4:9-16, 13:12-20)).
- Prater had an appointment and asked someone else to cover his daily chore. The cook stated, in Goodwin's presence, that Prater did not do his chore. Prater says that the chore was covered, but then the cook said that the chore was not performed to his standards, and Goodwin yelled that whatever the cook says goes and that Prater needed to "honor" it. (Id. ¶ 4, Ex. B (Prater Depo. at 78:2-79:25, 85:2-88:11 & Ex. B-B at 4:19-23, 17:1-3, 20:27-21:2)).
- Prater says that although wake-up time on weekends is 8:00 a.m., on May 17, 2014, a staff member woke him up at 7:00 a.m. to do bathroom chores that he says were assigned to someone else. (Id. ¶ 4, Ex. B (Prater Depo. Ex. B-B at 4:25-28, 7:16-19, 14:1-5)).
- Goodwin threatened to throw people out of HVEHF who did not help out around the Facility. (Id. ¶ 4, Ex. B (Prater Depo. Ex. B-B at 5:25-6:6, 16:26-27)).
- On May 18, 2014, the television news media visited the Facility, and Goodwin advised HVEHF residents about that visit several hours before the media arrived. Prater did not wish to speak to the media and stayed in his room while the media was at the Facility. He did not see or speak with anyone from the media during the visit. He did not see anything on television about the visit and has no knowledge that his name or face were ever televised. (Id. ¶ 4, Ex. B (Prater Depo. at 116:2-118:11)).

Prater did not like living at the Facility and said so to Ms. Geiser (his VA clinical

psychologist). (Capabianco Dec. ¶ 4, Ex. B (Prater Depo. at 39:24-40:4, 125:12-24, 140:10-12, 154:17-155:2). He complained to his HVEHF case manager, Oliver Perry, that one of his roommates walked around the room naked. (Id. ¶ 4, Ex. B (Prater Depo. at 125:20-126:12)). Perry discussed with Prater that if he had conflicts with his roommates, Prater should bring them to the Facility staff's attention, rather than try to handle the matter himself. (Id. ¶ 4, Ex. B (Prater Depo. at 59:13-18). Perry agreed to move Prater to another room when one was available. (Perry Decl., ¶¶ 7-8, Ex. F). Several days later, Prater reported to his psychiatrist, Dr. Zambrano, that he had been having issues with his roommate, but that he had since moved to another room. (Id. ¶ 4, Ex. C at 288-292).

For their part, defendants say that, during Prater's stay at HVEHF, the staff received a number of complaints from other Facility residents about him:

- On April 14, 2014, while Perry was investigating another conflict between Prater and his roommate, Prater's roommate complained that he was being bullied by Prater. Perry spoke with Prater about the incident and concluded that Prater, who was on parole at that time, was unable to let go of his prison mentality. (Perry Decl. ¶¶ 8-9, Ex. F).
- The next day, April 15, 2014, one of Prater's roommates complained to Terzian that Prater was a bully and that he felt threatened because Prater spoke about being in prison and things he had done to other people while incarcerated. (Terzian Decl., ¶ 3, Ex. G; Perry Decl. ¶ 10, Ex. F).
- On April 21, 2014, one of Prater's roommates told Terzian that Prater pushed him around, and he could not take living with Prater anymore. That roommate accepted Terzian's offer to move him (the roommate) to a different room. (Terzian Decl., ¶ 4, Ex. H). That same day, Perry opined that Prater was not a good fit for the HVEHF, in part, because Prater threatened his roommates and resisted Perry's feedback about what Prater needed to do to stay at the Facility. (Perry Decl. ¶ 11, Ex. F).
- The next day, April 22, 2014, during a VA counseling session, Prater said that he

was having interpersonal difficulties with the people he lived with. (Capabianco Decl. ¶ 5, Ex. C at 277-278).

- By May 15, 2014, several residents reported to Terzian that Prater was disrespectful and they did not feel comfortable around him. Terzian says he tried to discuss the matter with Prater, but the conversation was terminated when Prater became aggravated and upset. (Terzian Decl. ¶ 5, Ex. I).
- On May 26, 2014, another one of Prater's roommates complained to Terzian that he did not feel comfortable around Prater. As a result, Terzian moved Prater to another room. (Terzian Decl., ¶ 6, Ex. J).

Defendants say that during a June 5, 2014 staff meeting, HVEHF staff reviewed Prater's case and concluded that he needed to find alternate housing because of his bullying and threatening behavior. (Terzian Decl. ¶ 7, Ex. K). Facility staff consulted with a VA social worker to help Prater find other housing, and the social worker referred Prater to the Julian Street Inn mental health shelter in San Jose. (Id.). One Mary Ann Deschaine of the VA told Prater that HVEHF discharged him from the Facility due to his bullying behavior. (Capabianco Decl. ¶ 4, Ex. B at 132:13-17, 136:4-11).

This lawsuit followed. Broadly construed, Prater's complaint alleges violation of 42 U.S.C. § 1983, intentional infliction of emotional distress, negligence, invasion of privacy, and civil rights violations. Defendants maintain that Prater was discharged because of his bullying behavior and because he did not follow the Facility's rules. They move for summary judgment on the ground that there is no evidence giving rise to any genuine issues of material fact that would entitle Prater to relief. For the reasons to be discussed, defendants' motion is granted.

## LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the

absence of a triable issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In order to meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses.  See Nissan Fire & Marine Ins. Co., Ltd., 210 F.3d at 1102.  The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial.  See id.  A genuine issue of fact is one that could reasonably be resolved in favor of either party.  A dispute is "material" only if it could affect the outcome of the suit under the governing law.  Anderson, 477 U.S. at 248-49.

"When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Celotex Corp., 477 U.S. at 325).  Once the moving party meets this burden, the nonmoving party may not rest upon mere allegations or denials, but must present evidence sufficient to demonstrate that there is a genuine issue for trial.  Id.

## DISCUSSION

### A.     42 U.S.C. § 1983

The complaint alleges that defendants violated Prater's constitutional rights under the 14th Amendment.  In his summary judgment opposition, Prater also says that defendants violated his constitutional rights under the 1st, 5th, and 8th Amendments.  At the summary judgment stage, liberal pleading standards are inapplicable, and new claims cannot properly be raised for the first time on summary judgment.  Tucker v. Union of Needletrades, Industrial and Textile Employees, 407 F.3d 784, 787 (6th Cir. 2005) (citing Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004)).  But, even taking the additional alleged constitutional violations into consideration, the end result is the same:   Prater's § 1983 claim cannot stand because there is no

evidence that defendants are state actors.

Constitutional claims under 42 U.S.C. § 1983 are not cognizable against private individuals and entities because such individuals and entities do not act under color of state law, an essential element of a § 1983 action. Gomez v. Toledo, 446 U.S. 635, 640 (1980); Van Ort v. Estate of Stanewich, 92 F.3d 831, 835 (9th Cir. 1996). Here, defendants have presented evidence that they are a private individual and a private entity. (Goodwin Decl., ¶¶ 1-3).

Prater offers no evidence to the contrary, but points to the fact that defendants contract with the DVA. However, there is no evidence that the DVA is a state actor either. Moreover, the mere fact that a private entity enters into a contract with the government for the provision of services does not transform the contractor's acts into government ones. See Rendell-Baker v. Kohn, 457 U.S. 830, 841 (1982) ("Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts.").

In any event, there is no evidence that the defendants were performing a public function that is traditionally the exclusive prerogative of the state, or that any state actor played a role in the events at issue in this lawsuit. Plaintiff submitted a copy of a "Healthcare for Homeless Veterans and Grant and Per Diem Programs: Veteran Orientation Packet" ("Orientation Packet") he says he received.[3] That document, however, confirms that the VA does not manage or instruct programs like the one run by defendants:

> Every program is different and the VA recognizes these projects as independent and autonomous projects that operate based on designs that are funded through a competitive process annually. The VA has no authority to instruct or manage [Grant Per Diem] programs directly.
>
> *****
>
> Each [Health Care for Homeless Veterans/Grant Per Diem] program is unique and operates independent from the VA. The eligibility criteria, admission and discharge process is specific to each program and is available upon request.

(Dkt. 70 at ECF pp. 18, 20).

[3] Defendants object that the Orientation Packet has not been properly authenticated. Prater, however, may testify as to documents he claims to have personally received.

Defendants' summary judgment motion is granted as to this claim.

**B. Intentional Infliction of Emotional Distress**

To prevail on a claim for intentional infliction of emotional distress, a plaintiff must show "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." Hughes v. Pair, 46 Cal.4th 1035, 1050 (2009) (citations omitted). "A defendant's conduct is 'outrageous' when it is so extreme as to exceed all bounds of that usually tolerated in a civilized community." Id. at 1050-51 (citation omitted). "And the defendant's conduct must be intended to inflict injury or engaged in with the realization that injury will result." Id. at 1051. "Liability for intentional infliction of emotional distress does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Id.

Prater "bears the burden of proving a prima facie case of intentional infliction of emotional distress," and "defendant[s] can seek summary judgment by pointing out the absence of evidence to support plaintiff's claim." Dove v. PNS Stores, Inc., 982 F. Supp. 1420, 1425 (C.D. Cal. 1997). "Summary judgment is proper if a claim cannot reasonably be regarded as so extreme and outrageous as to permit recovery." Schneider v. TRW, Inc., 938 F.2d 986, 992 (9th Cir. 1991) (citation omitted). "Severe emotional distress means . . . emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." Id. (citation omitted).

There is no evidence in the record presented upon which a trier of fact reasonably could find in Prater's favor. Essentially, plaintiff complains that he was subjected to "forced labor" and that Goodwin repeatedly threatened to throw out residents who did not help out around the complex. (Capobianco Decl. ¶ 4, Ex. A). He points to the incident in the dining room when Goodwin yelled at residents when no one volunteered to help in the kitchen, as well as to the incident where a dispute arose between the cook, Goodwin, and Prater as to his compliance with assigned chores. Prater receives mental health services. But, while a plaintiff's susceptibility to emotional distress, and a defendant's awareness of such susceptibility are factors to be considered,

"such factors must be considered in light of all the circumstances surrounding the defendant's offensive conduct." Dove, 982 F. Supp. at 1425 (citing Alcorn v. Anbro Eng'g, Inc., 2 Cal.3d 493, 499 (1970)). Here, the record shows that, as a condition of staying at the HVEHF, residents were required to (among other things) help with chores. Prater agreed to those conditions and, in doing so, he acknowledged that failure to comply could result in immediate dismissal from the Facility. (Goodwin Decl., ¶ 5; Capabianco Decl. ¶ 4, Ex. B (Prater Depo. at 30:7-19, 31:8-32:8 & Exs. B-M & B-O); Perry Decl., ¶¶ 5-6, Exs. D & E). There is nothing extreme or outrageous about enforcing the Facility's rules. Nor is there any evidence suggesting that defendants enforced those rules with the intent of causing emotional distress.

Prater presents the declaration of one Ursula Sears, who reportedly is or was employed as an HVEHF staff counselor. (Dkt. 70 at ECF pp. 29-30). He argues that the declaration is proof that defendants have a habit of mistreating people at the Facility. Defendants object to the declaration on numerous grounds, including that it is unsigned. (The signature block on the declaration contains only a "/s/" rather than a signature, and plaintiff acknowledged at oral argument that Sears did not actually sign the declaration.) Defendants' evidentiary objections are well taken and this court sustains them. Fed. R. Evid. 401, 402, 403, 602.

Even if the court were to consider the Sears declaration, it does not raise a genuine issue of material fact sufficient to defeat summary judgment. In sum, Sears describes her dissatisfaction with her employment at HVEHF, asserting that Goodwin "belittled" and "degraded" her and sometimes failed to pay her for her work. She opines---in conclusory fashion and without establishing the basis for her personal knowledge---that Goodwin told staff to make negative comments about Prater and that Goodwin "oppressed veterans" and "treated [them] like Hitler treated Jews . . . ." The Sears declaration is simply not probative of Prater's claims. Fed. R. Evid. 401, 402, 403, 602.

Defendant's summary judgment motion as to this claim is granted.

**C. Negligence**

"Negligent infliction of emotional distress is a form of the tort of negligence, to which the elements of duty, breach of duty, causation and damages apply." Huggins v. Longs Drug Stores

Cal., Inc., 6 Cal.4th 124, 129 (1993); see also Spates v. Dameron Hosp. Ass'n, 114 Cal. App. 4th 208, 213 (2003) ("The negligent causing of emotional distress is not an independent tort, but the tort of negligence. The traditional elements of duty, breach of duty, causation, and damages apply. Whether a defendant owes a duty of care is a question of law.") (internal quotation marks and edits omitted)).

Here, plaintiff does not identify any duty that defendant allegedly owed him. The gravamen of this lawsuit is that he felt that he was required to engage in "forced labor" in order to stay at the Facility and was threatened with being discharged if he did not comply. As discussed, however, the HVEHF's rules required residents to perform chores and help out at the complex in order to stay at the Facility, and Prater agreed to those rules as a condition of his residency there. (Goodwin Decl., ¶ 5; Capabianco Decl. ¶ 4, Ex. B (Prater Depo. at 30:7-19, 31:8-32:8 & Exs. B-M & B-O); Perry Decl., ¶¶ 5-6, Exs. D & E).

The record suggests that Prater also contends that defendants negligently failed to provide him with mental health care. (Dkt. 61 at ECF p. 74). However, the evidence presented demonstrates that defendants are not mental health care providers (Goodwin Decl., ¶¶ 1, 4) and that while at the HVEHF, Prater continued to receive mental health services directly from the VA. (Capabianco Decl., ¶ 4, Ex. B (Prater Depo. at 119:25-120:5, 140:10-12, 154:17-155:2)). Plaintiff has identified no basis from which a trier of fact reasonably could find or infer that defendants owed him a duty to provide mental health care.

Defendants' summary judgment motion is granted as to this claim.

**D. Invasion of Privacy**

Plaintiff claims that his privacy was invaded when the media visited the Facility. It is unclear whether he bases this claim on the federal constitution or state law. As discussed above, however, plaintiff has no basis for a § 1983 against defendants. The court therefore will treat this claim as arising under state law.

To establish a claim for invasion of privacy, Prater must show "(1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern." Wright v. Specialized Loan Servicing, LLC, No. 1:14–

cv–01587–JLT, 2014 WL 5308633, at *3 (E.D.Cal., Oct. 16, 2014) (quoting Shulman v. Group W Productions, Inc., 18 Cal.4th 200, 215, 74 Cal.Rptr.2d 843, 955 P.2d 469 (1998)). "'The right to privacy is violated only by public disclosure to the public in general, or to a large number of persons, as distinguished from an individual or a few persons.'" Id. (quoting Friddle v. Epstein, 16 Cal.App.4th 1649, 1659, 21 Cal.Rptr.2d 85 (1993)).

The record presented contains no evidence that any invasion of Prater's privacy occurred. Indeed, the unrefuted evidence shows that Goodwin told residents beforehand that the media would be visiting; Prater did not want to interact with the media because he did not want people to know he was at the Facility; and so, he stayed in his room the entire time. (Capabianco Decl. ¶ 4, Ex. B (Prater Depo. at 116:2-118:11)). At the motion hearing, plaintiff argued that he should not have had to stay in his room to avoid the media. But, there simply is no evidence raising a genuine issue of material fact as to the lack of any public disclosure of any of Prater's private information.

Defendants' summary judgment motion as to this claim is granted.

**E. Alleged Civil Rights Violations**

In discovery, defendants asked Prater to identify the civil rights he claims were violated. (Capabianco Decl., ¶ 4 (Prater Depo., Ex. B-B at ECF pp. 74-75)). They now move for summary judgment on the ground that there is no evidence of any civil rights violations as to any of the matters identified in his discovery responses. The court agrees.

Prater asserted that "HVEHF has no visible certified mental health clinical workers, or social workers that may address the mental issues of veterans within the facility, at hand." (Capabianco Decl., ¶ 4 (Prater Depo., Ex. B-B at ECF p. 74)). As discussed above, however, the unrefuted evidence demonstrates that defendants are not mental health care providers (Goodwin Decl., ¶¶ 1, 4) and that while at the HVEHF, Prater continued to receive mental health services directly from the VA. (Capabianco Decl., ¶ 4, Ex. B (Prater Depo. at 119:25-120:5, 140:10-12, 154:17-155:2). He has identified no "right" to obtain mental health services from the Facility.

Several statutes Prater identified do not pertain to civil rights violations at all. See, e.g., Cal. Civ. Code § 1431.2 (pertaining to several liability for non-economic damages); Cal. Civ.

United States District Court
Northern District of California

Code § 3294 (pertaining to exemplary damages). Other statutes cited by Prater do not appear to have anything at all to do with defendants, who are not health care providers. See, e.g., Cal. Civ. Code § 3333.1 (pertaining to negligence of health care providers; evidence of benefits and premiums paid; subrogation); Cal. Welf. & Inst. Code § 4242 (part of a statutory scheme pertaining to the administration of state institutions for the mentally disordered). As for Cal. Welf. & Inst. Code §§ 4900, 4905, those provisions are part of a statutory scheme pertaining to the power and authority of California's protection and advocacy agency. There is no evidence that any complaint was made to that agency or that defendants had knowledge of any such complaint.

Cal. Civ. Code § 54.3 is part of the California Disabled Persons Act (CDPA), which "is concerned solely with physical access to public spaces." Wilkins-Jones v. Cnty. of Alameda, 859 F. Supp.2d 1039, 1054 (N.D. Cal. 2012). Prater has not alleged any architectural or physical barriers to his access to the Facility and its services, much less provided any evidence of the same. Although the CDPA incorporates the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq., Prater has not established any ADA violation either. In sum, he has not presented evidence raising a genuine issue of material fact that defendants discriminated against him because of his disability. See, e.g., Moeller v. Taco Bell Corp., 816 F. Supp.2d 831, 847 (N.D. Cal. 2011) (stating that to establish a Title III ADA claim, a plaintiff must prove, among other things, that he suffered discrimination "*because* of his or her disability.") (emphasis added) (citing Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc., 603 F.3d 666, 670 (9th Cir. 2010)).

California Civil Code section 43 provides: "Besides the personal rights mentioned or recognized in the Government Code, every person has, subject to the qualifications and restrictions provided by law, the right of protection from bodily restraint or harm, from personal insult, from defamation, and from injury to his personal relations." Cal. Civ. Code § 43. "This provision effectively codifies causes of action for various common law torts, such as assault and battery." Ingram v. San Francisco Police Dep't, No. C13-0224 CW, 2013 WL 1701754 at *3 (N.D. Cal., Apr. 18, 2013). Prater has not presented any evidence of assault or battery. And, as explained in his discovery response, he claims that defendants violated his rights and exceeded their authority by "the repetitive threats by Irvin Goodwin to throw the people out who did not

help in the complex." (Dkt. 61 at ECF p. 75). As discussed above, however, the unrefuted evidence shows that doing chores and obeying the HVEHF rules were a condition of staying at the Facility; Prater agreed to those conditions and, in doing so, he acknowledged that failure to comply could result in immediate dismissal from the Facility. (Goodwin Decl., ¶ 5; Capabianco Decl. ¶ 4, Ex. B (Prater Depo. at 30:7-19, 31:8-32:8 & Exs. B-M & B-O); Perry Decl., ¶¶ 5-6, Exs. D & E).

Defendants' summary judgment motion is granted as to Prater's claim for alleged civil rights violations.

**ORDER**

Based on the foregoing, defendants' motion for summary judgment is granted as to all claims for relief. The clerk shall enter judgment for defendants and close this file.

SO ORDERED.

Dated: March 24, 2017

HOWARD R. LLOYD
United States Magistrate Judge

5:14-cv-04876-HRL Notice has been electronically mailed to:

Christopher Kyle Prater kcprater74@gmail.com

Jennifer J. Capabianco jcapabianco@selmanbreitman.com, ttaylor@selmanbreitman.com

United States District Court
Northern District of California